**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS STEPHEN GUNN, | No. C 07-0347 SI (PR) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| JAMES A. YATES, Warden, | |
| Respondent. | (Docket Nos. 41 & 42) |

## INTRODUCTION

This is a federal habeas corpus action filed by a state prisoner pursuant to 28 U.S.C. § 2254.[1] For the reasons set forth below, the petition is denied.

## BACKGROUND

In 2002, a Mendocino Superior Court jury convicted Petitioner of various sexual crimes against children under the age of fourteen, possession of sexual images of children, and exhibition of harmful matter to a minor.[2] The trial court sentenced Petitioner to a determinate

---

[1] First filed in 2006 in the Eastern District of California, the action was transferred to the Northern District and received herein in January 2007.

[2] Petitioner was convicted of two counts of committing lewd acts with a child under 14 years (Cal. Pen. Code, § 288(a)), one count of attempting to commit a lewd act with a child under 14 years (§§ 664/288(a)), three counts of exhibiting harmful matter to a minor with the intent of seduction (§ 288.2(a)), three counts of annoying or molesting a minor (§ 647.6(a)), and two counts of possession of sexual images of a minor (§ 311.11(a)). The jury also found true allegations that Petitioner committed a lewd act against more than one victim and that he was a stranger to the victim or befriended the victim for the purpose of committing the lewd act (§§ 667.61(e)(5), 1203.066(a)(3) & (7)).

term of six years, and a consecutive indeterminate term of thirty-years to life in state prison. Petitioner appealed. The California Court of Appeal for the First Appellate District affirmed the conviction. (Ans., Ex. 6 at 33.) The California Supreme Court denied petitions for review and for writ of habeas corpus. (Id., Exs. 8 & 10.)

Evidence was presented at trial in support of the charges that Petitioner committed sexual offenses against Maria, age 6, Sara, age 9, Felicia, age 11, and Destinee, age 11. Prior bad act evidence of Petitioner's 1983 sexual molestation of another victim, Naomi, age 7, also was presented at trial. The state appellate court summarized the facts as follows:

> Maria was born in 1996. At all times relevant to this appeal, she lived in a Ukiah house with her seven year old brother, Tamara (Mother), and maternal grandmother (Grandmother). [Petitioner] lived in an apartment building behind Maria's house.
> 
> ....
> 
> [On May 24, 2002] Maria told Mother that she watched a movie "today" at [Petitioner's] house in which "this girl, she sucked a guy's dick." Mother had never heard Maria use this expression. Mother then asked Maria if anything else happened in the movie. Maria replied that the man "stuck his" penis in the girl's anus and vagina. Mother asked Maria why she was watching the movie, and Maria replied "[Petitioner] wanted her to." Maria also said that she and [Petitioner] were alone in his apartment while the movie was playing on his video cassette recorder. Mother telephoned the police, who arranged to have a detective contact her.
> 
> Three days later, May 27, 2004, Mother and Maria were returning from a visit with friends. Maria was crying. She told Mother she got a bump on her head when she fell on [Petitioner]'s wheelchair while trying to get out of his house. She also said [Petitioner] asked her to touch his penis while they were watching the movie, but she refused. Mother could feel a bump on Maria's head.
> 
> On May 30, 2004, Detective Kevin DeVries interviewed Maria . . . Maria told Detective DeVries that [Petitioner] told her to watch a movie. As she described the movie to DeVries, a boy took off a girl's clothes. While the movie was playing, Maria was on the floor and [Petitioner] was on his bed, touching his penis through his purple shorts. He told her to put her mouth on his penis. She refused and left his apartment. She got a bump on her head when she fell in his house. [Petitioner] had never before shown her a movie or asked her to touch him.
> 
> On June 5, 2002, the police searched [Petitioner]'s apartment. A hospital bed[3] and entertainment center containing a television and video cassette recorder were in the living room. A computer with an attached camera was in a second room. The

---

[3] Petitioner requires the use of a hospital bed and in-home care services because he is "severely overweight (345 pounds) and suffers from congestive heart failure, diabetes, arrhythmia, and sleep apnea." (Ans., Ex. 6 at 7; Ex. 2, Vol. 9 at 810.)

police seized the computer, floppy discs, videotapes, digital video discs (dvd's), photographs of young girls, and a photo of a young woman orally copulating an animal. Five of the videotapes depicted a man and woman engaging in sexual intercourse and oral copulation.

....

Victims Sara and Felicia C.

Felicia was born in 1991. Her sister, Sara, was born in 1993. Between January and June 2002 their mother had Valerie W. take care of them. Valerie has a daughter, Destinee, born in 1991, who is a friend of the sisters. Valerie was [Petitioner]'s in-home caregiver, and occasionally took the three girls with her to [Petitioner]'s apartment. They played computer games and watched television when they visited and once made a music video.

Several of the photographs and computer discs seized during the June 5 search of [Petitioner]'s apartment depicted Sara, Felicia and Destinee. A computer forensic analyst recovered images from the hard drive of [Petitioner]'s computer in which the faces of these girls had been "morphed," or superimposed, on naked or near naked adult female bodies. Detective DeVries then contacted the sisters' mother and showed her these photos and images.

After seeing the depictions, the sisters' mother asked them if anything had happened during their visits to [Petitioner]'s apartment. Felicia replied that [Petitioner] had taken nude pictures of them and Destinee; they had watched movies of people engaged in sexual acts on his computer and television; [Petitioner] had asked her to sit on his penis, which she did; and he had licked Sara and Destinee's vaginas. Sara agreed with Felicia and added that [Petitioner] had asked the three girls to touch each other.

On July 22, 2002, Detective DeVries interviewed Felicia and Sara. In the interview Felicia stated: On two occasions when Valerie had taken the three girls with her to [Petitioner]'s apartment but while Valerie was out of the apartment, he instructed Felicia to take off all her clothes and then took pictures of her using a camera on his computer. He told her she had a "beautiful body," and he wanted her to touch his penis. She did so reluctantly, and he said "that felt good." His pants were "down" at the time. He also told her not to tell anybody what had happened. He licked Destinee's vagina, but she would not allow him to touch her vagina. He gave her a banana that he wanted her to put by her crotch, but she refused. He also showed the girls videos on his television or computer depicting a man and woman engaged in sexual activities. While they watched the movie, he played with his exposed penis.

In her interview Sara stated: The three girls were alone with [Petitioner] in his apartment only once, while Valerie had gone to the store to buy groceries for [Petitioner]. During this visit, [Petitioner] showed them "nasty pictures" on his computer and repeatedly told them he was "horny." He was playing with his penis and wanted her and Destinee to touch it. They did so; he had his clothes on at the time. He took pictures of the vaginas of all three girls, but did not touch any of them. They watched a video in which two girls were doing "nasty stuff." Destinee told her not to tell anybody about what happened during this visit because she thought she would "get in trouble." Sara knew that Felicia thought they were alone with him twice.

3

On November 26, 2002, District Attorney Investigator Tim Kiely interviewed Felicia and Sara. A deputy district attorney, a representative from the victim witness program, and the sisters' mother were present during the interview. Felicia repeated what she had told Detective DeVries in July, and added more details of what occurred when the three girls were left alone with [Petitioner]. She stated that [Petitioner], who was in his hospital bed, instructed Sara to stand on the bed. While she stood up he licked her exposed vagina. He did the same thing with Destinee. While lying on the bed, he instructed Felicia to put her vagina on his penis. She pulled her slacks and underpants halfway down and sat on his visible penis. She told him she could not "do it" any more and got off the bed. She forgot to tell Detective DeVries during her July interview about this act of sitting on [Petitioner].

During her interview Sara stated: One of the "nasty" videos [Petitioner] showed the three girls depicted a naked girl and boy and a tied-up goat, and the boy put the goat's penis in the girl's vagina. Sara was sitting on the floor and [Petitioner] was sitting in his wheelchair when he asked her to touch his penis. Later he lay on his bed and instructed her to get on top of him so he could lick her vagina. She did so after taking off her pants. He then licked Felicia's vagina, but she did not like it and got off him. Destinee did not get on top of him. The visit during which these incidents occurred was different from the visit during which [Petitioner] took pictures of the girls' naked vaginas. Sara had not told Detective DeVries about [Petitioner] licking her vagina because she was too embarrassed.

1983 Offenses

In 1983 Naomi M. was seven or eight years old and lived in Leggett, Mendocino County, with her sister Amy, then nine or ten years old, their mother, and mother's boyfriend, Ron. [Petitioner] was a friend of Ron and stayed with them for a while. He frequently babysat Naomi and Amy. While babysitting them, he put his hands on their vaginas, and made them touch his penis. On one occasion he was seated between the girls on the living room floor and put one hand on Naomi's vagina inside her underpants. He did the same thing to Amy with his other hand.

Several months later Naomi, Amy, their mother, a different boyfriend, Jim, and Grandpa, an older man whom her mother took care of, moved to South Leggett. [Petitioner] also stayed at this house for a while. On one occasion at the South Leggett house Naomi and [Petitioner] were in the bathroom, and he put his hand on the back of her head and forced her mouth onto his exposed penis. Naomi did not tell her mother immediately because she feared [Petitioner] would harm her mother. After [Petitioner] went away from their house, Naomi and Amy decided to inform their mother about his behavior. Her mother subsequently confronted [Petitioner] in Naomi's presence, and he admitted his acts. Naomi also talked to a child protective services worker and the police about his conduct, and testified in court proceedings about it. During this proceeding she testified that she and Amy were always together when [Petitioner] touched them, but her testimony was false because there were occasions when Naomi was alone with [Petitioner].

(Ans., Ex. 6 at 2–6) (footnote removed).

Petitioner testified at trial. He denied that he had had any sexual contact with the victims. He also denied that he showed them any videos, computer images, or photographs having sexual

contact. According to his testimony, Maria on her own started playing a pornographic video Petitioner had in his house. (Id. at 9–10.) Petitioner testified that he shut off the video as soon as he realized what was playing. (Id., Ex. 2, Vol. 9 at 857.) Petitioner also testified that "he cannot see or reach his penis due to his large stomach." (Id., Ex. 6 at 9–10.) The Court notes that Destinee testified in support of Petitioner at trial. (Id. at 6.)

As grounds for federal habeas relief, Petitioner alleges that (1) defense counsel rendered ineffective assistance in violation of the Sixth Amendment, (2) the trial court's admission of prior bad acts evidence under California Evidence Code § 1108 violated his right to due process, and (3) the trial court's evidentiary rulings had the effect of denying Petitioner his due process rights to present a defense and confront witnesses.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but

United States District Court
For the Northern District of California

unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

**DISCUSSION**

**1.   Assistance of Counsel**

Petitioner claims that defense counsel rendered ineffective assistance by (A) failing to cross-examine prosecution witnesses regarding a specific incident; and (B) failing to prepare certain defense witnesses to testify.[4] (Pet. 5–5(a).)

Claims of ineffective assistance of counsel are examined under Strickland v. Washington, 466 U.S. 668 (1984). In order to prevail on a claim of ineffectiveness of counsel, a petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. Id. at 687–68. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a probability sufficient to undermine

confidence in the outcome. Id. Where the defendant is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.

---

[4] Petitioner also alleged that defense counsel had a conflict of interest. (Pet. at 5(a).) Because this claim was unexhausted, Petitioner moved to dismiss such claim. (See Docket No. 18.) The Court granted this motion. (See Docket No. 20.)

6

### A. Cross-Examining Witnesses

Petitioner contends that he told defense counsel that he caught two of the alleged victims, Sara and Felicia, in his shower, naked and masturbating with his bath oils. (Pet. at 5.) He allegedly urged defense counsel to cross-examine Sara and Felicia regarding this incident. Defense counsel, according to Petitioner, refused on grounds that he did not want to upset the witnesses.[5] (Id.) Petitioner did not testify as to this alleged incident. (Ans., Ex. 2, Vol. 9 at 809–945.)

A difference of opinion as to trial tactics does not constitute denial of effective assistance, see U.S. v. Mayo, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. See Bashor v. Risley, 730 F.2d 1228, 1241 (9th Cir. 1984).

Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances. See Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).

Petitioner has not shown that he is entitled to habeas relief on this claim. As to the first Strickland prong, Petitioner has not shown that defense counsel's performance was deficient. Assuming that defense counsel was aware of the alleged shower incident, his tactical decision not to question the witnesses regarding it was reasonable under the circumstances. First, there was no evidence other than Petitioner's assertion that such an event occurred. Defense counsel's decision not to present a set of unsupported facts appears reasonable. Second, had questioning on such a topic upset the witnesses, it is not unreasonable to assume that the jury may have pitied the witnesses, and formed a dislike to defense counsel. Furthermore, the prosecutor well may have tried to use such evidence to support the charges against Petitioner, that is, that Plaintiff

---

[5] Petitioner was assigned three defense attorneys over the course of his prosecution. Petitioner appears to contend that the trial court violated his right to the effective assistance of counsel by allowing such substitutions of counsel. (Pet. at 5.) Petitioner has not shown with any specificity, however, how such substitutions adversely effected the quality of his legal representation.

7

inspired their sexual activity. On this record, Petitioner has not shown that defense counsel's performance was deficient.

As to the second Strickland prong, Petitioner has not shown prejudice. The alleged shower incident indicates only that the girls were behaving in a sexual manner. The incident does not support Petitioner's innocence, nor undermine in any significant way, the evidence adduced against Petitioner. Accordingly, Petitioner's claim is DENIED.

### B. Preparing Witnesses

Petitioner contends that defense counsel failed to interview witnesses Petitioner asked counsel to call on his behalf. (Pet. at 5(a).) Petitioner asserts that although defense counsel did subpoena these witnesses, he "made no attempt to prepare them for trial." (Id.) "Because my counsel failed to meet and interview my Spanish speaking neighbors with a translator about what would be expected of them, being Mexican [n]ationals[,] they arrived in court confused and intimidated." (Petitioner's Mem. of P. & A. in Support of Order to Show Cause at 7.)

Whatever its merits, Petitioner's claim is insufficiently detailed. He has not explained in any detail how such allegedly deficient performance adversely affected his defense. For instance, Petitioner has neither named the witnesses, nor pointed to specific examples of testimony demonstrative of a lack of preparedness. Without a reasonably detailed articulation of his contentions, this Court must deny Petitioner's claim. Accordingly, Petitioner's claim is DENIED.

///

8

## 2. Prior Bad Act Evidence

Petitioner claims that the trial court's admission of the 1983 incidents as prior bad act evidence under California Evidence Code § 1108 violated his right to due process. (Pet. at 5.)

The state appellate court summarized the facts as follows:

> Prior to trial, the prosecutor moved for admission of the 1983 Naomi/Amy incidents under Evidence Code section 1108. The prosecutor's motion states that [Petitioner] was held to answer on numerous sexual assault charges in 1984, but [Petitioner] left California before the scheduled trial occurred and was absent until 1992. The parties agreed the case was tried twice, both trials ending in a mistrial.
>
> The trial court concluded the 1983 incidents were admissible under Evidence Code section 1108. It found there was "commonality" between the 1983 and the present incidents, insofar as they both involved pairs of sisters, each of whom was present during some or all of the alleged assaultive acts; the pairs of sisters were of similar ages; both sets of incidents took place in [Petitioner]'s residence or living quarters; [Petitioner] occupied a position of trust or control; and some of the specific acts were similar. It also found that, notwithstanding the 19 year time span, there was a "propensity" that could reasonably be drawn from the circumstances of the 1983 incident that was relevant to the present charges. Making a Evidence Code section 352 analysis, the court found that presenting evidence of the 1983 incident would not have a serious impact on the length of trial; the jury instructions adequately explained the use of the prior bad acts; and the probative value of the prior acts outweighed their prejudice.

(Ans., Ex. 6 at 28–29.)

At a trial in which a defendant is charged with committing a sexual offense, California Evidence Code section 1108 allows the introduction of evidence that the defendant committed other, uncharged sexual offenses. Such evidence is admissible under section 1108 provided that the probative value of the evidence is not outweighed by its prejudicial effect.

The Due Process Clause has limited operation "beyond the specific guarantees enumerated in the Bill of Rights." Dowling v. United States, 493 U.S. 342, 352 (1990). State law violates the Due Process Clause only if "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Montana v. Egelhoff, 518 U.S. 37, 43 (1996). The Supreme Court has not found that the introduction of propensity evidence offends the Due Process Clause. Indeed, the Supreme Court has expressly left open that very question. Estelle v. McGuire, 502 U.S. 62, 75 n. 5 (1991). Because it is an open

9

question, it is not clearly established federal law that the admission of propensity evidence — such as evidence that Petitioner committed sexual offenses in 1983 similar to those he was accused of committing in the instant matter — violates due process.

Furthermore, courts have "routinely allowed propensity evidence in sex-offense cases, even while disallowing it in other criminal prosecutions." United States v. LeMay, 260 F.3d 1018, 1025 (9th Cir. 2001). In fact, "California's Rule 1108 was modeled after the Federal Rules, and contains an express requirement that courts balance the probative value of the evidence against its prejudicial effect." Wolff v. Newland, 67 Fed. Appx. 398 (9th Cir. 2003).

With respect to the instant matter, because the Supreme Court has left open the question of the admission of propensity evidence, Petitioner's claim that the trial court's admission of propensity evidence under section 1108 violated his constitutional rights is without merit. Accordingly, Petitioner's claim is DENIED.

### 3. The Trial Court's Evidentiary Rulings

Petitioner claims that the trial court's evidentiary rulings regarding admission of two videotaped interviews violated his due process right to present a defense and confront witnesses. (Pet. at 6.) The first interview was of Sara's and Felicia's mother, and the second was of Destinee.

#### A. Videotaped Interview of Sara's and Felicia's Mother

The state appellate court summarized the relevant facts and its decision on the claim as follows:

> Defense counsel asked the court to play the videotape of the mother's interview during his cross-examination of [Detective] DeVries. He noted that in her interview with DeVries the mother was very angry and was basically making a threat against [Petitioner]. He also noted that her statements during her July 2002 interview with DeVries contrasted with her December 2002 trial testimony in which she stated she was not upset and only cried a little bit. He argued her "angry" interview demeanor was relevant to his defense theory that, given the change in the daughters' statements between July and December, their mother

10

> influenced them during that period. As he argued, her demeanor would help demonstrate that her trial testimony that she never spoke to her daughters about [Petitioner]'s conduct after the July interview was "simply not credible."
>
> After viewing the videotape, the court denied [Petitioner]'s request under Evidence Code section 352. It concluded the evidence's marginal relevance regarding the mother's attitude during the interview was outweighed by the undue consumption of time and potential for jury confusion on the collateral information in the videotape.
> ....
>
> [W]e find no error. Through [Petitioner]'s cross-examination of Felicia and Sara, their mother, and Detective DeVries, and his direct examination of Valerie [Destinee's mother], [Petitioner] had ample opportunity to test Felicia and Sara's mother's credibility. The court could reasonably conclude the videotape showing the mother's demeanor during her July interview with Detective DeVries was cumulative on that issue and thus unduly time-consuming.

(Ans., Ex. 6 at 25–26, 28) (footnote removed).

"State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quotations and citations omitted). The exclusion of evidence does not violate the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Montana v. Egelhoff, 518 U.S. 37, 42 (1996). "While the Constitution prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Holmes, 547 U.S. at 325–26.

The state's latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments, which include the right to confront the witnesses and evidence adduced against the accused. See Holmes, 547 U.S. at 324. To this end, the Confrontation Clause serves purposes of ensuring that witnesses will testify under oath, forcing witnesses to undergo cross-examination, and permitting the jury to observe the demeanor of witnesses. U.S. v. Medjuck, 156 F.3d 916, 919

11

n.1 (9th Cir. 1998).

Applying these legal principles to the instant matter, the Court cannot say that the state appellate court's ruling resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. First, the ruling did indeed avoid an undue consumption of time. As the state appellate court noted, Petitioner already had had an opportunity to call the mother's credibility into question. Second, and related to this first point, because Petitioner had an opportunity to examine this witness, his rights to present a defense and confront witnesses were not violated. On this record, the Court must deny Petitioner's claim.

## B. Videotaped Interview of Destinee

The state appellate court summarized the relevant facts and its decision on the matter as follows:

> [Petitioner] asked to play the 20 minute videotaped police interview of Destinee [who testified in support of Petitioner at trial]. During the interview Detective DeVries told Destinee that he could give her a lie detector if she was not telling the truth and then asked if she knew what a lie detector test was. [Petitioner] argued the videotape bolstered Destinee's credibility because, even after this quasi-threat, she continued during the interview to deny to the officer that [Petitioner] harmed her. It would also show that the interview technique DeVries used with her differed from the technique he used with Sara, Felicia, and Maria, where he made no reference to a lie detector. He argued this difference was relevant to the bias of the investigation and would explain the inconsistent testimony between Destinee and the other three girls. The court denied the request under Evidence Code section 352, on the grounds the undue consumption of time to show it outweighed its probative value.
>
> Detective DeVries was subsequently recalled as a witness for the defense. He testified that while interviewing Destinee he picked up cues from her body language and statements that suggested she was not being truthful, and he could "possibly" point out these cues on the videotape. [Petitioner] reiterated his request to show the videotape to demonstrate what DeVries observed that led to his concern about Destinee's veracity. The court noted that the videotape was relevant for this purpose, but also noted the videotape was not admissible under any hearsay exception, nor could DeVries testify as to his opinion about Destinee's credibility. Under Evidence Code section 352, it denied the request out of concern the jury would have too much difficulty distinguishing the purposes for which the tape could and could not be used.
>
> ....
>
> [T]he court could conclude that the videotape of Destinee's interview with DeVries would have created a real danger of confusing and misleading the jury, given the limited use to which the questions and answers in the interview could

12

> be put. It could also have concluded that any limiting instruction would have been unsuccessful at adequately explaining the allowed and unallowed uses of the interview statements. [Citation removed.] Additionally, the court could have concluded that showing the videotape was cumulative to evidence from which the jury could evaluate DeVries's bias: his own cross-examination testimony, the testimony of Dr. Fraser regarding the effect of interview techniques on possible child abuse victims, and Destinee's testimony describing her interview with DeVries.

(Ans., Ex. 6 at 26–27, 28.)

Applying these legal principles to the instant matter, the Court cannot say that the state appellate court's ruling was resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. First, as with the above claim, the ruling did indeed avoid an undue consumption of time, and a confusion of issues. As the state appellate court noted, Petitioner had had an opportunity to examine Destinee and establish her credibility. Second, and related to this first point, because Petitioner had an opportunity to examine DeVries and Destinee, his right to present a defense and confront witnesses were not violated. On this record, the Court must deny Petitioner's claim.

## **PENDING MOTIONS**

There are two pending motions. In both, Petitioner asks the Court to grant his petition on grounds that Respondent has not responded to Petitioner's response to Respondent's answer. (See Docket Nos. 41 & 42.) Respondent is not obligated to respond to such a filing, and Petitioner has not cited any binding legal authority to the contrary. Accordingly, Petitioner's motions (Docket Nos. 41 & 42) are DENIED.

///

**CONCLUSION**

For the foregoing reasons, the petition for writ of habeas corpus is DENIED.

Petitioner's pending motions (Docket Nos. 41 & 42) are DENIED.

This order terminates Docket Nos. 41 & 42.

A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Petitioner may seek a certificate of appealability from the Court of Appeals.

The Clerk shall enter judgment in favor of Respondent, and close the file.

**IT IS SO ORDERED**.

DATED: January 19, 2010

SUSAN ILLSTON
United States District Judge